# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

**JOHN AARON VANDERBURG**                                     **PLAINTIFF**

**VERSUS**                                     **CAUSE NO.: 1:08cv90-LG-RHW**

**HARRISON COUNTY, MISSISSIPPI, ET AL.**                       **DEFENDANTS**

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, John Aaron Vanderburg ("Vanderburg"), by and through her undersigned counsel, submits this Response in Opposition to Defendant Harrison County's ("Defendant") Motion for Summary Judgment and would show unto the Court, the following:

In the case at bar, genuine issues of material fact exist preclude summary judgment. First, the excessive force employed against Mr. Vanderburg by the correctional officers has two different factual versions – Mr. Vanderburg has one version and the Defendants have another. Second, the injuries sustained by Mr. Vanderburg are a genuine issue of material fact due to the physical evidence, photos, nurses notes, and various accounts of the injuries sustained. Third, the knowledge of Sheriff George Payne and the Harrison County Board of Supervisors with respect to the widespread abuse of inmates at the Harrison County Adult Detention Center ("HCADC") and the adoption of an "official policy" is a genuine issue of material fact due to the admissions in the numerous plea agreements of various correctional officers, Steve Martin's report submitted to the Sheriff and Board of Supervisors, deposition testimony of George Payne, deposition testimony of William Martin, deposition testimony of Bobby Eleuterius, deposition testimony of Regina Rhodes, sworn testimony of various other individuals, and this Court's finding of a genuine issue of material fact with respect to an "official policy" at HCADC in *Alves v. Harrison*

*County, et al.*, Civil Action No. 1:06-cv-912-LG-RHW (S.D. Miss. Feb. 23, 2009). Finally, the custom and practice of abuse being a moving force behind the assault on Ms. Carrubba is a genuine issue of material fact due to the admissions in the numerous plea agreements of various correctional officers, Steve Martin's report submitted to the Sheriff and Board of Supervisors, deposition testimony of George Payne, deposition testimony of William Martin, deposition testimony of Bobby Eleuterius, deposition testimony of Regina Rhodes, sworn testimony of various other individuals, and this Court's finding of a genuine issue of material fact with respect to a moving force in *Alves*.

Accordingly, Defendant's Motion for Summary Judgment should be denied due to numerous genuine issues of material fact.

**I.    Summary Judgment Standard**

"Summary judgment is proper when there exists no genuine issue of material fact and the movant is entitled to judgment as matter of law." *Strong v. Univ. HealthCare Sys.*, L.L.C., 482 F.3d 802, 805 (5th Cir. 2007). "The evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant." *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 465 (5th Cir. 2005). To survive a summary judgment motion, the nonmovant "need only present evidence from which a jury might return a verdict in his favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**II.    Excessive Force Used Against Mr. Vanderburg**

**A.    Applicable Law**

The appropriate analysis of excessive force claims by pre-trial detainees is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir.

2

1993). Often, there is no evidence of the correctional officer's subjective intent, ad the trier of fact must base its determination on objective factors suggestive of intent. *Id.* at 1446. The Fifth Circuit suggests the following factors: (1) extent of the injury suffered; (2) need for the application of force; (3) relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of the forceful response. *Id.* at 1447. An officer's malice can be evident from the very excessiveness of his conduct. *Id.*

**B.    Facts**

Plaintiff was brought to the HCADC on the night of May 26, 2005 on suspicion of driving under the influence. Upon arriving at the HCADC, Mr. Vanderburg was placed against a wall to await booking procedures. See DVD of video surveillance [Docket No. 199]. While against the wall, Mr. Vanderburg witnessed an assault and violent takedown of a small, female inmate. *Id.*; See Exhibit "A", John Aaron Vanderburg deposition, pp. 97-117. Mr. Vanderburg was concerned for the female inmate's well being, and moved slightly off the wall. *Id.* The female inmate was thrown violently to the ground and then wrapped in restraints and a face-mask and placed in a restraint chair. Multiple deputies performed this use of force. See video [Docket No. 199]. Interestingly enough, a use of force report was never performed for these actions on the female inmate.

After the female inmate was placed in the chair, Mr. Vanderburg made a comment to Defendant Teel. Mr. Vanderburg stated to Defendant Teel, "do you think you guys can handle that girl all by yourself." Exhibit "A", p. 100, Lines 3-4. Teel responded to Mr. Vanderburg that "this will be you if you don't shut your f***ing mouth." *Id.* at p. 102, Lines 16-17.

After this incident, Mr. Vanderburg was ordered to the booking counter, and Mr.

Vanderburg complied with that request. *Id.* at p. 105, Lines 15-19; See video. While at the booking counter, Mr. Vanderburg was still handcuffed while the officers performed a pat down and began to remove Mr. Vanderburg's shoes and socks. *Id.* at pp. 107-116. The officer holding Mr. Vanderburg's right arm began pulling his arm up into the air causing Mr. Vanderburg pain. *Id.* Mr. Vanderburg told the officers that his arm was hurting and asked if the officers to take it easy. *Id.* Mr. Vanderburg was not resistive and the video demonstrates that he was not resistive. *Id.* While Mr. Vanderburg asked that the officers not pull up on his handcuffed arms, the officers took Mr. Vanderburg to the concrete floor, while cuffed, and Mr. Vanderburg landed knees first and then face. *Id.*

About three months prior to Mr. Vanderburg's arrest, Mr. Vanderburg had major knee surgery on his left leg. *See* Exhibit "B", photos. Mr. Vanderburg informed the officers of his bad leg, but this did not deter them. *See* Exhibit "A" p. 107-116. Defendant Teel drove his knee into the back of Mr. Vanderburg's neck and pulled his leg above his head. *Id.* Mr. Vanderburg was then placed in a holding cell.

### C. Genuine Issues of Material Fact

There are significant genuine issues of material fact with respect to the correctional officers' unnecessary use of force upon Mr. Vanderburg. Mr. Vanderburg never resisted the booking officers. Mr. Vanderburg never made a move towards the booking officers because he was handcuffed the entire time. Mr. Vanderburg posed no threat to the booking officers. Despite this, Defendant Teel unnecessarily and unjustifiably took Mr. Vanderburg to the concrete floor while handcuffed.

The video clearly shows that Mr. Vanderburg never made any movements or threatening behavior towards the booking officers. In fact, the video of Mr. Vanderburg's incident highlights

the atmosphere of the jail at the time Mr. Vanderburg's incident occurred. The use of the restraint chair on the small, female inmate was clearly excessive; and the fact that a use of force report was not completed further demonstrates the reckless disregard that existed in booking relative to the rights of the persons in the facility. Once Defendant Teel was questioned by Mr. Vanderburg with respect to the handling of the female inmate, Defendant Teel was ready and determined to show Mr. Vanderburg exactly how things should be handled. After Mr. Vanderburg's takedown, one officer commented to Mr. Vanderburg, "welcome to the house of pain."

The Defendants maintain that Mr. Vanderburg was resistive and this necessitated the takedown. However, the video shows no such resistance. Thus, it is Mr. Vanderburg's word against that of the Defendants as to what exactly happened and who provoked the entire incident. There was no need to take Mr. Vanderburg to the ground while he was handcuffed and not resisting the booking officers. This action was done to punish Mr. Vanderburg, not to restore discipline. Genuine issues of material fact exist with respect to Defendants violent face-first takedown of Mr. Vanderburg. Summary Judgment should be denied.

### III. Plaintiff's Injuries More Than *De Minimus*

Mr. Vanderburg's surgically repaired leg was wrenched, his chin suffered abrasions, his legs suffered bruising, and he suffered emotional trauma from the Defendants actions and violent takedown while Mr. Vanderburg was handcuffed and non-resistive.

With respect to the excessive force claim, the Defendant's motion for summary judgment asserts that Plaintiff cannot establish that he suffered no more than a *de minimis* injury.

In *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), the Supreme Court held that a correctional officer's use of excessive physical force against a prisoner may in

an appropriate setting constitute cruel and unusual punishment of the prisoner, contrary to the Eighth Amendment, even though the prisoner does not suffer either "significant injury" or "serious injury." *Id.* 112 S.Ct. at 997 ("serious injury"), 998 ("significant in-jury"), 999 ("serious injury"), 1000 ("significant injury"). Likewise, *Hudson* clearly implies that merely because the injury suffered is only "'minor'" does not of itself always preclude finding an excessive force violation. *Id.* at 1000. *Hudson*, looked largely to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* 112 S.Ct. at 999. For purposes of this inquiry, *Hudson* placed primary emphasis on the degree of force employed in relation to the apparent need for it, as distinguished from the extent of injury suffered. *Id.*

A showing of some type of injury, more than *de minimus*, is necessary to assert an excessive force claim. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). In order to determine whether injuries caused by excessive force are *de minimus*, **the context in which the force was used must be examined**. *Id.* (emphasis added). "[T]he amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances."'" *Id.* at 703-04 quoting *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996)).

In *Gomez v. Chandler*, 163 F.3d 921 (5th Cir. 1999), in concluding that a prisoner's injury was not *de minimis*, the Court stated that the "application of force" was "of a character far [more] intense and [more] calculated to produce real physical harm," *Gomez*, 163 F.3d at 924. The focus was on the application of force under the context, not the extent of the physical injury suffered.

As the Fifth Circuit stated in *Beck v. Alford*, 1994 WL 442383 at *1 (5th Cir. July 27,

6

1994), when "there are allegations of injury together with circumstances that suggest that more than *de minimis* injury **could have occurred**, or that the use of whatever force there was would shock the conscience, the stage is set for a credibility contest, and the case should go to a finder of fact." (emphasis added). It is clear that the law in Fifth Circuit focuses on the application of force, the context the force was used, and the injury that could have happened, not what injury actually did occur.

In the case at bar, it is clear that Mr. Vanderburg suffered injuries resulting from Defendant's actions. Despite Defendant's characterization of Mr. Vanderburg's injuries as minor, these injuries are still actionable. As for Defendant's citation to *Siglar v. Hightower*, 112 F.3d 191 (5th Cir. 1997), *Siglar* dealt with an inmate receiving a bruised ear from the officer twisting it. In *Siglar*, the prisoner was stopped in the hall of his prison unit while returning from breakfast. *Id.* at 193. The guard found a biscuit in the prisoner's jacket pocket and called for backup. *Id.* The responding guard, "[w]ithout provocation, ... twisted Siglar's arm behind his back and twisted Siglar's ear." *Id.* "Siglar's ear was bruised and sore for three days but he did not seek or receive medical treatment for any physical injury resulting from the incident." *Id.* The Court held that this action did not rise to the level of excessive force and a constitutional violation, and thus, the injury was *de minimus*. In *Siglar* and the other cases discussed above, the focus was not on the resulting injury, but the context of the officers' actions and what harm could have happened to the plaintiff. In *Gomez v. Chandler*, 163 F.3d 921, 924 (5th Cir. 1999), for example, in concluding that a prisoner's injury was not *de minimis*, the Fifth Circuit distinguished *Siglar* not only on the extent of the physical injury that actually resulted, but also on the fact that the "application of force" was "of a character far [more] intense and [more] calculated to produce real physical harm," as was the case in the matter *sub judice*.

7

In this matter, the officers unnecessarily and unjustifiably took Mr. Vanderburg to the concrete floor, knees first and then face, while he was handcuffed.  There is no doubt that these actions did result in injuries, and **could have** resulted in far more serious injuries.  Defendant's 30(b)(6) designee, Captain Steve Campbell, who investigated use of force complaints, stated that when a person is taken to the ground face first, indeed, serious injuries can occur.  Exhibit "C" 30(b)(6) designee, Steve Campbell deposition pp.104-106, Lines 24-4.   The officers' actions in this context were not to restore discipline, but these actions were meant to punish and cause harm to Mr. Vanderburg.  Mr. Vanderburg never refused the verbal commands nor was resisitive, but Defendants took their actions anyway.  The injuries and the circumstances clearly meet the threshold of more than *de minimus*.

In the instant matter, genuine issues of material fact exist regarding the need and amount of force used by the correctional officer; therefore, the Plaintiff's injuries cannot be determined to be *de minimus* simply by evaluating the physical nature of the injury.  See *Hull v. Ford*, 2007 WL 1839843 (5th Cir. June 25, 2007).

**IV.     Custom and Practice – Knowledge**

     **A.     Applicable Law**

Municipalities and counties can be held liable for Section 1983 claims for deprivation of civil rights.  A plaintiff is required to demonstrate the following three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the custom or policy.  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).  A policy may be evidenced by custom that is "a persistent, widespread practice of City [County] official or employees, which, although not officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy…" *Id.*

8

at 579 quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984).

A plaintiff must demonstrate that the municipality was "deliberately indifferent" to the known consequences of the policy. *Id.* at 580. Deliberate indifference is an objective standard that encompasses "not only what the policymaker actually knew but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights." *Lawson v. Dallas County*, 286 F.3d 257, 264 (5th Cir. 2002). Plaintiff must demonstrate that the policymaker had actual or constructive knowledge of the actions of his subordinates. *Webster*, 735 F.2d at 842. "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations are so widespread that they were the subject of prlonged public discussion or of a high degree of publicity." *Id.* The sheer numerosity of incidents can provide evidence of constructive knowledge. *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

### B. Application of Law to Facts

In the case at bar, it is undisputed that Sheriff Payne was the policymaker for the relevant time frame. As to an official policy being adopted, Plaintiff has alleged that a persistent, widespread practice existed at the jail whereby booking officers/ jailers abused, tortured, intimidated, and harassed pretrial detainees/inmates. Moreover, Plaintiff alleges that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had actual knowledge of the violence at the jail, and in the alternative, that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had constructive knowledge of the violence at the jail. In support of these allegations, Plaintiff relies on the following pieces of evidence.

### 1. Plea Agreements

Former correctional officers have signed plea agreements and entered guilty pleas for violations of prisoners/pre-trial detainees civil rights. See Exhibit "D". In the plea agreements, Regina Rhodes, Morgan Thompson, Daniel Evans, Karl Stolze, Thomas Wills, Dedri Caldwell, and William Jeffery Priest each admitted to assaulting and witnessing assaults of inmates at the detention center. Thompson and Caldwell admitted they each participated in over 100 assaults against inmates between May 17, 2004 and August 28, 2006. Evans admitted that he had participated in several assaults against inmates and witnessed numerous assaults of inmates by other officers. Stolze admitted he participated in several assaults against inmates and he and his co-conspirators "engaged in a pattern of conduct that included, but was not limited to . . . assaulting inmates, knowing that the physical force was unnecessary, unreasonable, and unjustified." William Jeffery Priest also admitted he committed numerous assaults on inmates. The conduct described in the plea agreements includes punching, kicking, and choking inmates. These officers also admitted they submitted false and misleading reports regarding their misconduct.

This practice of abuse and violence was so widespread and over such a period of time that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had either actual or constructive knowledge of the activities.

### 2. Steve Martin Report

Steve Martin investigated the HCADC on behalf of the Department of Justice. Martin submitted a report, dated February 1, 2005, wherein he stated that there was a "very disturbing pattern of misuse of force" at the HCADC. See Exhibit "E", Martin report. Martin also found a "lack of appropriate review of incidents" and "the failure to properly investigate the incidents."

*Id.* This report was sent to both the Sheriff and Harrison County Board of Supervisors. See Exhibit "F", Letter dated July 20, 2005.

Defendant asserts that Sheriff Payne did not receive this report until after Mr. Vanderburg's incident. However, Sheriff Payne admitted to having regular monthly conversations with Steve Martin with respect to conditions at the jail. See Exhibit "G", 30(b)(6) designee, Exhibit "H" George Payne deposition p. 26-27, Lines 25-2. Moreover, Sheriff Payne admitted to having conversations with Supervisor William Martin about the violence at the jail. *Id.* at p. 114, Lines 13-23.

Sheriff George Payne admitted receiving Martin's report. During his deposition, Sheriff Payne stated that he assigned Major Riley and Steve Campbell, of the Professional Standards Unit, to investigate the claims in the report. *See* Exhibit "G", p.24, Lines 1-13. However, during the deposition of 30(b)(6) designee Steve Campbell, Campbell stated he was never requested by Sheriff Payne to investigate these claims contained in Martin's report. *See* Exhibit "C", p.54, Lines 9-15. Indeed, when asked about Steve Martin, Campbell stated, "[W]ell, what I got from him was inmates never do anything wrong, correction officers always screw up." *Id.* at p. 52, Lines 5-7.

Now, Sheriff Payne has submitted an affidavit wherein he states that once he received Martin's report, he forwarded it to the Federal Bureau of Investigation; however, Sheriff Payne never mentioned this during his deposition and no record has been produced showing the report was forwarded to the FBI. It is clear that there are conflicting accounts as to whether the Sheriff took this report seriously. Sheriff Payne stated that he requested Campbell to investigate, but Campbell denies this occurred. Sheriff Payne did not mention the FBI with respect to the report during the deposition, but in support of the summary judgment motion, he now mentions

11

involves the FBI. Clearly, the prison officials such as Campbell did not think too highly of Martin, and did not take his report seriously.

Martin's report provides official notice to both the Sheriff and Board of Supervisors about the escalating violence at the jail. However, as is evident in the plea agreements with respect to the time frame of abuse (2004-2006), the officials in charge did nothing to discourage such violence despite being on notice that it was occurring.

### 3. Deposition of Sheriff Payne, in his official capacity

During his deposition, Sheriff Payne was asked the following question and responded in the following way:

> Q: Do you believe that this is a – this problem in these plea exhibits is a problem you should have known about?
>
> A: **Yeah.** I don't know if it was possible for me to know about it, but I wish I'd have known about it. (emphasis added).

See Exhibit "G", 30(b)(6) deposition of Defendant, Payne testimony, p. 51, Lines 11-16 (emphasis added). During the deposition, Sheriff Payne's answer was "Yeah", but then he paused for a few seconds, and provided a qualifier. But his admission that he "Yeah" probably should have known creates a genuine issue of material fact to preclude summary judgment on the issue that Sheriff Payne had either actual or constructive knowledge of the violence at the jail.

Finally, during his deposition, Sheriff Payne acknowledged he spoke with Harrison County Board of Supervisor member William Martin about Martin's report and the violence at the jail. This is confirmed by William Martin who testified that he had spoken with Sheriff Payne regarding the violence at the jail over a number of years. See Exhibit "H", William Martin deposition, p. 22. When William Martin was asked to explain his concerns about violence at the

jail, he testified that the Board periodically received complaints from inmates that they were being beaten. *Id.* Martin testified that Payne replied that they were working on the problem. *Id.* Finally, board member Bobby Eleuterius also testified that remembered receiving Steve Martin's report, but does not remember anything being done about it. See Exhibit "I", Eleuterious deposition, pp.44-45, Lines 16-5.

As is evident by the sworn testimony of Sheriff Payne and certain Board members, it is clear that both Sheriff Payne and the Board of Supervisors had either actual or constructive knowledge of the problem of violence at the HCADC.

### 4.     Regina Rhodes Deposition

Regina Rhodes testified that the practice of abuse of inmates "was almost daily" while she was employed at HCADC from 2004 to 2006. Exhibit "J", Regina Rhodes deposition p. 14, Lines 3-9. Rhodes described the pattern of abuse that she personally observed while she worked in booking at the HCADC. Rhodes described practices such as: red light/green light (*i.e.* abusing detainees in areas that would not be visible); targeting and taunting of persons who had been brought in on drinking charges or were drunk; falsifying reports; encouragement to falsify reports; special names for days of the week; and beating, kicking and otherwise abusing inmates. *Id.* at pp. 9-18.

This abuse and violence was so widespread and over such a period of time that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had either actual or constructive knowledge of the activities.

### 5.     Teel Trial Testimony

The correctional officers testified they frequently referred to an unofficial policy of "red light, green light," which meant that officers should only strike inmates in areas that would be

13

concealed by the jumpsuit worn by prisoners. See Exhibit "K", William Priest testimony, p. 424, Lines 11-16. The face and head would therefore be considered a "red light," while the chest would be considered a "green light." The officers also testified regarding ways in which they would "fool" the surveillance cameras in booking to make it appear that inmates were resisting when in fact they were not. *Id.* at p. 408. They also testified that they would yell "stop resisting" to make others believe their violence against inmates was in response to resistance by the inmates. *Id.* at p. 435. The officers also had special names for the days of the week, such as "Thump a Thug Thursday." See Exhibit "L", Moore testimony, p. 556. The officers felt that the unnecessary assaults were funny and humorous. See Exhibits "K" and "L". Morgan Thompson testified that he felt like he lost touch with humanity and forgot that these inmates were human beings, and he confirmed this belief in his deposition testimony in this matter. *See* Exhibit "M", Morgan Thompson deposition p. 44, Lines 10-18.

This abuse and violence was so widespread and over such a period of time that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had either actual or constructive knowledge of the activities.

      6.    *Alves v. Harrison County, et al.*, **Order dated Feb. 23, 2009**

This District Court found the following with respect to a custom of abuse of inmates at the jail during the relevant time frame and the knowledge of the Sheriff and Board of Supervisors:

> sufficient evidence from which a jury could conclude that the custom of abuse of inmates at the jail was sufficiently widespread to constitute an official policy. The Court further finds that the evidence that hundreds of unjustified assaults were committed against inmates between 2004 and 2006 tends to show that Sheriff Payne either knew or should have known of the violence. Specifically, even members of the Harrison County Board of Supervisors, who were farther removed from the jail

14

>than the Sheriff, were aware of the culture of violence and inmate abuse at the jail. Finally, the evidence of this custom of abuse at the jail is indicative of deliberate indifference. As a result, the Court finds that a genuine issue of material fact exists regarding whether the custom of inmate abuse at the jail was sufficiently widespread so as to constitute an official policy of which the Sheriff had actual or constructive knowledge.

Accordingly, Defendant's assertion that there are not genuine issues of material fact with respect to the custom and practice of abuse and the relevant knowledge thereof is incorrect.

## V.     Moving Force

As discussed *supra*, the officer involved in the assault on Mr. Vanderburg has been convicted of numerous similar assaults. Also, there is a significant amount of evidence before the Court that the officers in the booking area of the jail believed it was humorous to wrongfully assault inmates (*i.e.* taunting, teasing, naming days of the week, etc.). Accordingly, for all of the reasons cited above, there are genuine issues of material fact with respect to whether the custom of inmate abuse was a moving force behind the assault of Mr. Vanderburg.

## VI.     Conspiracy

Using the evidence that is discussed at length *supra*, there are genuine issues of material fact with respect to whether a custom of which Sheriff Payne had constructive, or actual, knowledge caused the development of a conspiracy to assault inmates that was a moving force behind the violation of Mr. Vanderburg's constitutional rights.

In summary, there are numerous genuine issues of material fact which preclude summary judgment in this matter. Accordingly, the Court should deny Defendant's Motion for Summary Judgment.

RESPECTFULLY SUBMITTED

JOHN AARON VANDERBURG, Plaintiff

BY:   BROWN BUCHANAN, P.A.


BY:   */s/Patrick R. Buchanan*_____
       PATRICK R. BUCHANAN
       MARK V. WATTS

PATRICK R. BUCHANAN (MSB #8439)
MARK V. WATTS (MSB #102204)
BROWN BUCHANAN, P.A.
796 VIEUX MARCHE, SUITE 1
POST OFFICE BOX 1377
BILOXI, MS  39533-1377
TELEPHONE: (228) 374-2999
FACSIMILE:   (228) 435-7090

## CERTIFICATE OF SERVICE

      I, the undersigned, do hereby certify that I have this day mailed by United States mail, postage prepaid, a true and correct copy of the foregoing pleading to the following counsel:

Karen Jobe Young
Meadows Law Firm
Post Office Box 1076
Gulfport, MS  39502

Cyril T. Faneca
Haley Necaise Broom
Joe Crawford Gewin
Dukes, Dukes, Keating & Faneca
Post Office Drawer W
Gulfport, MS  39502-0680

Ian A. Brendel
James L. Davis III
Post Office Box 1839
Gulfport, MS  39502-1839

      This, the 14th day of December, 2009.

                                            */s/ Patrick R. Buchanan*
                                            PATRICK R. BUCHANAN

PATRICK R. BUCHANAN (MSB #8439)
MARK V. WATTS (MSB #102204)
BROWN BUCHANAN, P.A.
796 VIEUX MARCHE, SUITE 1
POST OFFICE BOX 1377
BILOXI, MS  39533-1377
TELEPHONE: (228) 374-2999
FACSIMILE:   (228) 435-7090