## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

JOHN AARON VANDERBURG                §                          PLAINTIFF
                                     §
V.                                   §          CAUSE NO. 1:08cv90-LG-RHW
                                     §
HARRISON COUNTY, MISSISSIPPI, BY     §
AND THROUGH ITS BOARD OF             §
SUPERVISORS; et al.                  §                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER GRANTING IN PART
## AND DENYING IN PART PAYNE'S MOTION FOR SUMMARY
## JUDGMENT AND DENYING HIS SECOND MOTION TO STRIKE

BEFORE THE COURT are Defendant Harrison County Sheriff George Payne's Motion

for Summary Judgment [196] and Motion to Strike Plaintiff's Evidentiary Exhibits Submitted in

Support of Response to Defendant's Motion for Summary Judgment [230].  Plaintiff John Aaron

Vanderburg brought this action for the alleged abuse he received while in the custody of the

Harrison County Adult Detention Center ("HCADC").  Payne argues (1) there is no evidence of a

constitutional violation (2) nor a policy, (3) which was the moving force behind the violation; (4)

Vanderburg fails to state a Section 1985 claim; (5) there was no conspiracy; (6) he has not lost a

civil action, and (7) Payne is not liable for Section 1983 punitive damages.  Payne further argues

that Vanderburg's Exhibits A, B, D-F, and J-L are inadmissible on summary judgment because

they are (8) unsworn, (9) unauthenticated, (10) hearsay, (11) irrelevant, (12) untrustworthy, (13)

unduly prejudicial, (14) character evidence, (15) subsequent remedial measures, (16) "back door"

expert opinion, and (17) not based on personal knowledge.  The Court has considered the parties'

submissions and the relevant legal authority.  Summary Judgment is granted on the Section 1983

conspiracy to deny access to courts and punitive damages claims.  The Section 1985 claims are

dismissed without prejudice.  The remainder is denied.

## FACTS AND PROCEDURAL HISTORY

On the evening of Thursday, May 26, 2005, Vanderburg was arrested and charged with careless driving, DUI, no seat belt, resisting arrest, and possession of paraphernalia by the Pass Christian Police Department.  He was placed into the custody of the HCADC.  Upon his arrival, Officer Ryan Teel and several other officers were using force upon a small female detainee, which included taking her to the floor, wrapping her in a mummy suit, placing a hood on her head, and tying her into a restraint chair, and then leaving her.  According to Vanderburg, he asked Teel if he could handle her all by himself.  That is when Vanderburg alleges Teel threatened him.  One minute and twenty-four seconds later, Teel and other officers take Vanderburg to the ground while removing his socks and shoes.  The officers then shackled Vanderburg to a bench for an hour and a half.  Shortly after he was shackled, he testified that another deputy looked in the holding cell and said, "[W]elcome to the Harrison County house of Payne."  (Pl.'s Dep. at 117).

Vanderburg subsequently filed this lawsuit.  He brings official capacity claims against Payne under Sections 1983 and 1985 for excessive force; failure to provide medical care; covering up the alleged abuse; and conspiracies to use excessive force and to cover up the alleged abuse.

## DISCUSSION

<u>Motion for Summary Judgment</u>

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. To make this determination, the Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit. Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). A "material fact" is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The party that bears the burden of proof at trial also bears the burden of proof at the summary judgment stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986). "[W]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon . . . mere allegations or denials . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

I.      SECTION 1983

Payne seeks summary judgment on the excessive force, failure to train and supervise, denial of medical care, and conspiracy claims under Section 1983.

A claim against the sheriff in his official capacity is treated as a claim against the county, and sheriffs in Mississippi are the final policymakers with respect to all law enforcement decisions made within their counties. *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir. 1996). A municipality may be held liable under 42 U.S.C. 1983 when its official policies or customs violate the Constitution. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). The policy or custom must cause the constitutional tort. *Id.* at 691. "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Thus, to prove Payne is liable, in his official capacity, under Section 1983, Vanderburg must prove (1) the existence of a

policymaker, and (2) an official policy or custom, (3) which is the moving force behind a constitutional violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

### A.    EXCESSIVE FORCE

Payne first challenges the excessive force claim, arguing there was no excessive force.  In the alternative, Payne argues, that there was neither a policy of excessive force nor was it a moving force behind the violation.

#### 1.    CONSTITUTIONAL VIOLATION

The Due Process Clause, applicable to the States via the Fourteenth Amendment, protects a pretrial detainee from excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386, 395 n.11 (1989).  The standard for analyzing an excessive force claim under the Fourteenth Amendment is the same as the Eighth Amendment standard. *Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993).  This right is violated if there is (1) more than a de minimis injury, (2) which resulted directly and only from the use of force that was excessive to the need, and (3) the force was objectively unreasonable. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).  To determine whether the force was excessive, the inquiry is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993). "Often, of course, there will be no evidence of the detention facility official's subjective intent, and the trier of fact must base its determination on objective factors suggestive of intent." *Id.* Some of these factors would be (1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between the need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the

severity of the forceful response.  *Id.* at 1447 n.29.

Payne argues there was no excessive force because (1) Teel did not act maliciously and (2) Vanderburg did not suffer more than a de minimis injury.   Arresting officer Clark Diehl testified that the female detainee "looked Hannibal Lecterized.  She was pretty–you know, she had a knit, knit thing on her head.  And she was restrained and, you know, her feet were restrained in sort of like–it looked like a beach chair almost, you know."  (Diehl Dep. at 43).  Vanderburg testified that Teel was "torturing" the lady and "trying to put tape on her mouth," so Vanderburg asked Teel, "[D]o you think you guys can handle that girl all by yourself[?]"  (Pl.'s Dep. at 100, 102-03).  Vanderburg testified that Teel responded, "[T]his will be you if you don't shut your f[*]ck[*]ng mouth."  *Id.* at 102.  The video indicates that one minute and twenty-four seconds later, he took Vanderburg to the ground during the dress-out procedure, while Vanderburg was still handcuffed.  Specifically, Teel ordered Vanderburg to the booking counter.  Vanderburg testified that once there, one of the officers was raising his cuffed hands behind his back, which caused the handcuffs to tighten.  Vanderburg said he "looked back and said, man . . . what's going on, man.  You know I told him he was hurting my arm, to take it easy is what I said.  I said, take it easy, you're hurting me, you're hurting me, because he had my hand up."  *Id.* at 108.  All Diehl saw was, "it appeared when they took [Vanderburg's] left shoe off that he made, with his shoulders made, to his left made maybe a little more than a 90-degree turn back in towards the officer who was on his left side."  (Diehl Dep. at 44).  According to Vanderburg, after he complained that they were hurting his arms, Teel grabbed his torso and threw him onto the ground.

They slammed me down face first into the concrete floor. . . .  I think the weight

of the man pretty much got me down, my hands behind my head. I think I went knees first. I think I landed on my good leg first and then ended up on my stomach. And [Teel] put his knee in the back of my neck and proceeded to pull this leg–I'm on my stomach, and he proceeded to pull my bad leg behind my head. And I was like, oh, my God, man, I have a bad leg or something like that. And the lady at the desk says, he does have a bad leg. And [Teel] says, oh, which one, this one? And she said, yes.

(Pl.'s Dep. at 109-10). Vanderburg continued:

A.    . . . And then [Teel] acted like he was going to [pull] it, and then he did–pulled this one behind my head.

Q.    For the record, he acted like he was going to do the left leg?

A.    Yes, ma'am.

Q.    By the didn't actually pull it up?

A.    He didn't pull the left leg.
. . .

Q.    Okay. Then they pulled the–you're alleging they pulled the right leg up?

A.    Correct.

*Id.* at 114. Vanderburg said that Teel's knee on the back of his neck made it difficult to breathe and made him dizzy. Vanderburg said that he was not resisting but was just screaming that he had a bad leg. Then they put him in a holding cell and shackled his handcuffs to the leg of a bench, where they left him for about an hour and a half.

This evidence indicates that Teel and other officers slammed a handcuffed Vanderburg down, kneed the back of Vanderburg's neck, pulled his leg over his head, and shackled him to a bench for an hour and a half only because he spoke up for the woman and for himself. This evidence shows that he was restrained and not giving resistance. During the encounter Teel joked about hurting the very leg about which Vanderburg was complaining. This is evidence

-6-

from which a reasonable jury could conclude that Teel acted with malice.

As for whether or not Vanderburg suffered more than an de minimis injury, Payne argues, Vanderburg did not suffer an "appreciable injury." (Payne's Mem. Summ. J. at 13). Vanderburg responds there is a genuine issue of fact as to whether he suffered more than a de minimis injury.

The Fifth Circuit holds:

> In determining whether an injury caused by excessive force is more than de minimis, we look to the context in which that force was deployed. "The amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances."
> What constitutes an injury in an excessive force claim is therefore subjective--it is defined entirely by the context in which the injury arises.

*Williams v. Bramer*, 180 F.3d 699, 703-04 (5th Cir. 1999) (quoting *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996)).  For example, in *Williams*, the plaintiff was twice choked by a police officer.  *Williams*, 180 F.3d at 704.  The first time was during a search of the plaintiff's mouth. *Id.*  The second time was after the plaintiff threatened to report the police officer.  *Id.*  The court held that dizziness, loss of breath, and coughing did not qualify as more than de minimis injuries when the police officer was legitimately searching plaintiff's mouth.  *Id.*  However, these same injuries did "qualify as a cognizable injury when the victim is maliciously assaulted by a police officer."  *Id.*  This was because the "second choking of Williams was motivated entirely by malice.  Bramer was therefore not legitimately exercising force in the performance of his duties as an officer."  *Id.*

In this case there is evidence that the take down was not constitutionally permissible, but was entirely motivated by malice.  Vanderburg suffered dizziness and loss of breath, as well as other injuries over and above what the *Williams* plaintiff suffered.  Therefore, *Williams* compels

the conclusion that there is a dispute of fact as to whether Vanderburg suffered more than a de minimis injury.

## 2.    POLICY OR CUSTOM

Having found a question of fact regarding whether there was excessive force, the Court now considers whether there was an excessive force policy.  "Official policy is ordinarily contained in duly promulgated policy statements, ordinances, or regulations." *Piotrowski*, 237 F.3d at 579.  Where the policy is facially constitutional, the plaintiff must prove that "it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Id.* (quoting *Bd. of the Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997)).  A custom is a "persistent, widespread practice of [government] officials or employees, which, although not officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579.  "Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority."  *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984).  The Fifth Circuit held:

> Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Id.* at 842.  "[T]he sheer numerosity of incidents can provide evidence of constructive knowledge." *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

Vanderburg argues that there was a long-term, widespread custom of using excessive

force on pre-trial detainees and other inmates at the HCADC. First, he testified that after the use of force in the instant case, one of the deputies welcomed him to the house of pain/Payne. The video shows this deputy raise his fist to Vanderburg. He also presents evidence of hundreds of instances of excessive force at the HCADC from 2004 to 2006. He presents evidence that the Sheriff and the Board of Supervisors were warned of this widespread abuse several times before Vanderburg's incident on May 26, 2005.

For example, former Deputy Morgan Thompson, Sergeant Dedri Caldwell, and Deputy Thomas Wills each admitted to using unjustified force on over one hundred inmates while they worked at the jail and to witnessing over one hundred additional unjustified assaults committed by other deputies. According to Caldwell, the conspiracy began in 2001. According to Thompson, it ended in September 2006. Stolze and Priest admitted that they and other deputies engaged in a conspiracy to deprive persons of their right to be free from excessive force. This conduct occurred from 2003 to 2006. Likewise, former deputies Regina Rhodes, Daniel Evans, Karl Stolze, and William Priest admitted to personally participating in several instances of excessive force and to witnessing additional instances.

Rhodes testified that it was common for the correction officers to taunt the inmates who were brought into the booking room. She heard Stolze, Officer in Charge Teel, Thompson, and Wills engage in this taunting. Intoxicated inmates were more likely to be taunted because "[t]hey were easier targets." (Rhodes Dep. at 13). She observed a pattern of abusing inmates that included "striking, punching, kicking, choking and otherwise assaulting inmates in circumstances that did not justify the use of force." *Id.* at 13-14. She said this excessive force occurred "almost daily while I was employed there," "from May 2004 to February 2006." *Id.* at 14; (Rhodes Plea

Agreement at 3).  She testified that Teel often encouraged the correction officers to use excessive force and to get involved in instances of excessive force.

Timothy Brandon Moore worked at the jail from 2002 to 2005.  He testified that booking officers were mistreating people at the jail.  There was a meeting on April 20, 2005, with the booking staff.  The purpose of the meeting "was basically to blast booking.  It was aimed at the excessive force being used."  (Moore Test. at 548-49).  Despite this meeting, there was no change in booking.  It was a daily practice to prepare false reports to cover up excessive force.  The booking officers had discussions about the video cameras in booking and how to avoid detection of excessive force.  "Captain Gaston said several times, if you have to do anything, do it off camera, in the shower or in the hallway. . . .  The cameras were our enemy."  *Id.* at 555.  The booking officers had theme nights for different days of the week.  These included, "Thump a Thug Thursday, Fight Night Friday, Slap a Ho Saturday."  *Id.* at 556.  They were told to "kick[] ass and not tak[e] names," which meant "we were using excessive force and not writing reports." *Id.*  According to Moore the booking officers felt it was funny to use excessive force, and they would laugh and egg on each other.  Whenever a female officer had a female detainee in the shower for the dress out procedure, Teel would lead the booking officers in a chant of, "Spray the bitch," to encourage the female officer to use OC spray on the detainee.  *Id.* at 567.  When he led these chants, he would not be able to see if any force was needed.  If the female officer did not spray the detainee, the officer "[w]ould be known as an inmate lover."  *Id.*

Priest testified, whenever a detainee was being loud, the officers were instructed by Captain Gaston to get the detainee quiet by whatever means necessary.

A.       Again, sometimes you could talk a person out of it.  Other times, we may

> have to get a little physical and restrain them to the bench using the leg
> restraints.

. . .

> A.      There's several incidents.  Picking individuals up and throwing them on
> the bench, drag them to the floor, things of that nature.

> Q.      And at the time that this force was used, what was the person doing?

> A.      Probably just a whole lot of talking, belligerent actions.

(Priest Test. at 403).  The booking officers were instructed, "If an individual had gotten on our

nerves, was continuing to become a problem, maybe we need to teach that guy a lesson."  *Id.* at

408.  Several times Priest witnessed booking officers choke people until they passed out.  The

officers would sometimes spray the toilet seats and benches with OC spray.  They then would

laugh when an inmate would become contaminated with the spray.  The booking officers would

have multiple conversations about using excessive force and how to make it look like it was the

inmate's fault.  "Jokingly, if somebody was being abused.  It was sort of the thing to say, 'Stop

resisting,' whether they were or were not."  *Id.* at 435.  Priest likewise testified that the officers

joked about and encouraged each other to use excessive force.  He, too, testified it was a practice

to yell, "Spray the bitch," every time a female officer was dressing out a female detainee.  If the

officer did not, the others "[m]ight jokingly call her an inmate lover."  *Id.* at 436.

> A.      If you didn't take action against an individual inmate, then you may be
> labeled as inmate lover, somebody that is sympathetic towards inmates.

> Q.      What did it mean to be labeled an inmate lover?

> A.      Well, you're either with the group or you're not with the group.

*Id.*

Priest testified that, on October 4, 2005, detainee Only Al-Khidhr was brought in the

-11-

booking room.  Priest was not present, but he was briefed about Al-Khidhr when Priest came in on the next shift.  He saw the booking photo, which showed "a brutal mess.  He was beat up pretty bad."  *Id.* at 417.  Thompson admitted to Priest that he had beat up Al-Khidhr.  Thompson posted at least six copies of the booking photo all over booking.  When Priest took some down, he "was kind of warned away by Thompson telling me don't take them down.  Leave them up." *Id.* at 418.  The rest remained up at least throughout the day.

Rhodes testified that red light/green light was a phrase used in booking:

A.    Red light would be the facial area . . . you weren't supposed to hit anything that would show on a booking photo, and green light would be the rest of the body.

Q.    All right.  And how did y'all come to use red light, green light and determine where you should and shouldn't hit?

A.    Well, after Deputy Thompson had a particularly bad booking shot of an inmate named Only, OIC Teel had a impromptu meeting with our shift in the back of booking and inmate records and said that red light, green light–you know, that the chief was–the chief, Captain Gaston, was upset about the booking photo and that we needed to be more careful.

Q.    All right.  Be more careful where you hit people?

A.    Yes, sir.
. . .

Q.    Okay.  So it was okay to hit people as long as it didn't show up on the booking photo?

A.    Yes, sir.

(Rhodes Dep. at 10-11).  Her testimony indicates the red light green light practice was instituted in response to allegations that a deputy had struck another inmate in such a way as to show up on the booking photo.  Priest likewise testified that this practice was known to him.  After Priest had

hit a detainee in the mouth, Priest was chastised by Stolze:

> A.  He wasn't concerned about the inmate.  He was concerned about what I had done.

> Q.  Why was he concerned about what you had done?

> A.  He relayed to me that sort of phrase that we would use, red light/green light.  Red light meaning you don't hit to a part of the body that you can visibly see a mark.  Green light meaning you can hit an individual where it cannot normally be seen on the body, things of that nature.

(Priest Test. at 424).  This was a phrase with which Priest was already familiar.

There is evidence that, as early as February of 2005, Sheriff Payne was actually notified by the United States Department of Justice of its finding of 31 instances of force in a one month period from November 2004 to December 2004, which represented both a "serious increase in the use of force" as well as "a very disturbing pattern of misuse of force."  (Pl.'s Resp. Ex. E at 3); (Pl.'s Resp. Ex. F at 3).  When asked whether or not he should have known of the custom of excessive force, Sheriff Payne first testified, yes.  As he points out, he then denied this, but that is a credibility question for the jury.

Taken together, this and other evidence permit a reasonable jury to find that there was a custom of excessive force that was sufficiently widespread and persistent to constitute an official policy.  Immediately after the alleged assault, another deputy allegedly welcomes Vanderburg to the "house of Payne."  Further, the evidence that there were hundreds of instances of excessive force, and almost daily occurrences for at least one year prior to May 26, 2005, is sufficient to show that Sheriff Payne had at least constructive knowledge.  He admitted that he should have known and admitted that he was on notice for three months prior to the subject incident.  It is undisputed that even members of the Board of Supervisors for the County, who were further

removed from the jail than Sheriff Payne, were on notice of the alleged culture of violence at the jail.

### 3.   MOVING FORCE

The Court next considers whether there is evidence that the alleged policy of excessive force was the moving force behind the alleged excessive force against Vanderburg. After due consideration of the above evidence, the Court must answer this question in the affirmative. There is evidence that not only was another restrained, compliant detainee being assaulted, but that Vanderburg was assaulted for speaking out against this very practice.

### B.   FAILURE TO TRAIN AND SUPERVISE

Although the First Amended Complaint alleges a failure of the Sheriff, in his official capacity, to properly train and supervise, this allegation appears to be a part of the excessive force claim and not alleged as a separate claim. This issue is moot.

### C.   DENIAL OF MEDICAL CARE

Payne argues there is no evidence that any Harrison County officer was deliberately indifferent to Vanderburg's medical care needs and he was not injured as a result. Vanderburg does not respond to this argument.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "This is true whether the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care." *Id.* at 104-05. The "plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical

needs.'" *Domino v. Tex. Dep't of Crim. J.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). "The mere delay of medical care can . . . constitute a . . . violation but only 'if there has been deliberate indifference [that] results in substantial harm.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "Deliberate indifference . . . occurs only where a prison official subjectively knows of and disregards a substantial risk to the inmate's health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The "official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Easter*, 467 F.3d at 463. In addition, Section 1983 requires a showing of proximate causation, which is evaluated under the common law standard. *Murray v. Earle*, 405 F.3d 278, 290 (5th Cir. 2005).

For example, in *Easter*, the plaintiff alleged that "Powell refused to provide any treatment to, and ignored complaints of, a patient suffering from severe chest pain that she knew had a history of cardiac problems. Powell's alleged conduct meets the 'deliberate indifference' threshold." *Easter*, 467 F.3d at 464. In this situation, it was inferrable that Powell knew of the substantial risk of harm. *Id.* at 463. The court further noted that Easter's separate delayed treatment claim failed, because he did not allege that it resulted in serious harm. *Id.* at 464. However, he "clearly stated" a violation regarding his refusal to treat claim for the "severe chest pain he suffered during the period of time Powell refused to treat him." *Id.* at 464-65.

Payne first argues that no Harrison County officer had subjective knowledge of Vanderburg's medical needs. Four months prior to his arrest, he had knee surgery on his left knee, because he had "crashed the knee and broke both bones diagonally." (Pl.'s Dep. at 58). On the night of May 26, 2005, he was still having pain and although it "was getting better to where I

could walk, . . . I couldn't bend my knee." *Id.* at 60. He told the arresting officers he "was disabled" and "had a bad leg." *Id.* at 95. His scar was noted on the police report. The video shows that Teel was the officer who bent down and removed Vanderburg's left sock and shoe. He was wearing shorts at the time and had a surgical scar on his left leg. Teel then took him down and Vanderburg favored his left leg, and would not bend it. According to Vanderburg, Teel then "proceeded to pull my bad leg behind my head. And I was like, oh, my God, man, I have a bad leg or something like that. And the lady at the desk says, he does have a bad leg. And [Teel] says, oh, which one, this one? And she said, yes." *Id.* at 110. Vanderburg testified that he kept screaming out that he had a bad leg. Later, he said that he repeatedly complained that it was hurting him. This is evidence from which a reasonable jury could conclude that Harrison County officers did have subjective knowledge about Vanderburg's medical needs.

Payne alternatively argues that Vanderburg was not damaged because of this failure to treat. As *Easter* makes clear, in a failure to treat case, the plaintiff may recover for the pain he suffered during the time that the official failed to treat him. *Easter*, 467 F.3d at 464-65; *Thayer v. Adams*, 2010 U.S. App. LEXIS 23292 at *20 (5th Cir. Feb. 4, 2010); *Chapman v. Johnson*, 339 Fed. Appx. 446, 448 (5th Cir. Aug. 3, 2009) (affirming denial of qualified immunity for failure to give Ibuprofen for a swollen ankle). There is evidence that he had been slammed into a concrete floor, and immediately and repeatedly complained of pain in his bad leg, among other things. As a failure to treat claim, he may recover for the pain he suffered. Payne is not entitled to summary judgment on this claim.

### D.    CONSPIRACY

Vanderburg asserts Section 1983 claims against Payne for the alleged conspiracies to use

excessive force and to cover it up. Payne challenges the first conspiracy claim, arguing that Vanderburg admitted that he had no independent knowledge of the conspiracy. He responds that there is evidence of these conspiracies and of the resulting excessive force.

Payne has failed to demonstrate that he is entitled to summary judgment on the first conspiracy claim, because he does not argue that there is a lack of genuine issue of material fact on this point.

Moreover, there is evidence of such a conspiracy. "A conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act." *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995). To prove a conspiracy claim under Section 1983, the plaintiff must prove (1) a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy, by a party to the conspiracy. *Pfannistel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990). As discussed previously, Harrison County deputies admitted there was a conspiracy under color of law to use excessive force upon inmates in the booking room and admitted that Teel was a central figure in this conspiracy. It began as late as 2004 and ended as late as September, 2006. The above described evidence indicates that Vanderburg was subjected to excessive force as a result of this conspiracy.

Payne argues the second conspiracy claim fails because Vanderburg is presently bringing a civil action for the alleged excessive force. He responds that there is a genuine issue of material fact as to whether the conspiracy to cover up existed and whether there was a cover up of the alleged violations.

This particular conspiracy claim alleges a conspiracy to deny Vanderburg's access to

courts. To pursue this claim, he must prove that the conspiracy "hindered his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). It is not clear if he is pleading a "forward-looking" or "backward-looking" access claim. A forward-looking access claim is a case where the "litigating opportunity yet to be gained" is being blocked by the defendants. *Christopher v. Harbury*, 536 U.S. 403, 414 (2002). "The object . . . is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* at 413. He cannot prove a forward-looking denial of access, because he has in fact filed the excessive force claim.

A backward-looking claim is about "an opportunity already lost." *Id.* at 414-15. It looks "backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.* at 414. For a "backward-looking access claim," Vanderburg must prove (1) an underlying cause of action, (2) the litigation of which was frustrated by official acts, (3) which resulted in a lost remedy. *Id.* at 415-16. As for the third element, he:

> must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element.

*Id.* at 415. For example, the official deception "may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." *Id.* at 414.

The record indicates that Vanderburg had a previous excessive force lawsuit on these same allegations. (Campbell Aff. at 2 (¶3)). He brought the case pro se as *Vanderburg v.*

*Harrison County Sheriff's Department*, No. 1:05cv303-LG-JMR. It was filed on June 21, 2005 in this Court. That same day, Vanderburg sent a letter to the Sheriff's Department putting it on notice of the lawsuit, although he did not serve process. The case was dismissed without prejudice due to his failure to serve process. He refiled the allegations in the instant case, within the statute of limitations.

On the record as it presently stands, the Court finds no evidence that Vanderburg has lost a remedy for his excessive force claim. There has yet been no loss nor "inadequate settlement." The Court is provided with no evidence of a lost opportunity to sue Teel or others, or the lost opportunity to seek some particular relief. Therefore, Payne is entitled to dismissal of the Section 1983 conspiracy to deny access to the courts.

E. PUNITIVE DAMAGES

Payne seeks dismissal of Vanderburg's punitive damages claim under Section 1983. He does not respond to this argument.

Punitive damages are not recoverable on Section 1983 claims against a municipality. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Since the Sheriff, in his official capacity, is the County, Section 1983 punitive damages are not recoverable against him in his official capacity either. Payne is entitled to summary judgment on the Section 1983 punitive damages claim.

II. SECTION 1985

Payne argues that Vanderburg has failed to state a claim under Section 1985, because the First Amended Complaint does not describe any of the conduct proscribed by that statute. Vanderburg responds that there is a genuine issue of fact as to whether there was a conspiracy to

use excessive force and to cover up the excessive force. For the reasons stated in the Court's contemporaneous Order Denying Teel's Motion for Summary Judgment, the Court finds that the First Amended Complaint fails to state a claim under Section 1985. The Section 1985 claims are dismissed without prejudice.

MOTION TO STRIKE

Payne argues that Vanderburg's Exhibits A, B, D-F, and J-L are inadmissible on summary judgment.

I.      EXHIBIT A

Vanderburg's Exhibit A is his deposition. Payne argues that those portions which describe the contemporaneous use of force on the female detainee are irrelevant. As set forth more fully above, the incident with the female detainee is relevant to show, among other things, Teel's motivation and state of mind in using the force upon Vanderburg and custom and practice. Moreover, other exhibits, to which Payne did not object, contained evidence about the force on the female detainee. Finally, Payne himself referenced the incident with the female detainee as part of the justification for the use of force upon Vanderburg.

II.     EXHIBIT B

Vanderburg's Exhibit B are two photographs of the surgical scar on his left leg. Payne argues that the photographs are not authenticated, unduly prejudicial, not produced in discovery, and irrelevant. The Court did not rely upon the photographs, therefore these objections are moot.

III.    EXHIBIT D

Vanderburg's Exhibit D is the Plea Agreements and two Judgments in the criminal cases in which several booking room deputies admitted to excessive force.

First, Payne argues that Rhodes, Evans, Stolze, Wills, and Caldwell's plea agreements were not attached as exhibits. To the contrary, these plea agreements comprise the majority of Exhibit D. Specifically, they are found at Exhibit D, pages 2-26, 50-56, and 63-69.

Second, Payne argues that the Plea Agreements and Judgments are not sworn to nor certified. These documents are court records that were filed in criminal cases presided over by the undersigned. Most of the documents are available to the public through the CM/ECF system. The plea agreements are each signed by several persons, and the judgments are signed and entered by the undersigned. The Court has compared the documents in Exhibit D with those filed in their respective cases in the CM/ECF system and finds that they are authentic. *See United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) (holding that a document may be authenticated with circumstantial evidence, including the document's own distinctive characteristics). The Court further notes that, in each respective criminal case, the plea agreement and its basis was sworn to, in open court, before the undersigned.

Payne thirdly argues that the plea agreements are hearsay. As this Court has previously ruled, these pleas are public records that fall within the public records and reports exception. Fed. R. Evid. 803(8). Moreover, they are statements against interest. Fed. R. Evid. 804(3).

Payne next argues that Exhibit D is irrelevant as to whether he should have had constructive knowledge, because (1) the events contained in the pleas are subsequent to Vanderburg's alleged beating, (2) the pleas and judgments are subsequent to Vanderburg's alleged beating, (3) they are "vague and non-specific," and (3) Payne did not have actual knowledge. (Payne's 2d Mot. to Strike at 7). On the contrary the pleas describe conduct prior to Vanderburg's incident. Specifically, the conduct occurred from as early as 2001 until 2006. The

Court does not find the pleas vague and non-specific. Whether they are is a credibility question for the jury. Payne admits that his knowledge is in issue; thus, whether or not he had constructive knowledge is relevant to this case.

Payne argues the pleas and Judgments are untrustworthy because the pleas were negotiated and Thompson recanted portions of his plea in his deposition. Credibility is not for the Court to decide on summary judgment. This argument attacks the weight and not the admissibility of the evidence.

Finally, Payne argues that the evidence is prejudicial because it is an attempt to inflame the jury with evidence of the beating death of Jessie Lee Williams. There is no jury, as this was evidence submitted on a motion for summary judgment. Finally, the Court did not consider the Williams incident.

## IV.     EXHIBITS E AND F

Exhibit E is the February 2005 report from Steve Martin of the Department of Justice. Exhibit F is a July 2005 transmittal letter which purports to send the report to Sheriff Payne. Payne argues that both are irrelevant because "although Steve Martin's report is dated February 1, 2005, Payne did not received this report until after July 20, 2005." *Id.* at 13. Payne, however, admitted he received this report on February 1, 2005. He has since sought to retract that admission, but that is a credibility question to be decided by a jury and not a basis to exclude evidence.

Payne further objects and argues that both are inadmissible because they are not sworn nor authenticated. Payne admitted he received this report in his deposition. He referenced the report and transmittal letter in his affidavit he submitted on summary judgment.

Payne further objects to them because they reference the Court's 1995 Consent Judgment. The Court did not rely on them for the Consent Judgment, nor rely on the Consent Judgment itself, so this objection is moot. Further, Payne's affidavit that he submitted on summary judgment referred to the Consent Judgment in defense of Payne's actions, so this objection is also waived.

Payne objects to the report and letter as evidence of a subsequent remedial measure. A subsequent remedial measure has to be *subsequent* to the incident in issue. Fed. R. Evid. 407. "When, *after* an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of *subsequent* measures is not admissible to prove . . . culpable conduct. . . ." *Id.* (emphasis added). The report came prior to Vanderburg's incident. Further, the report and letter are not offered to prove that Payne is liable for violating the 1995 Consent Judgment, nor did the Court rely on them for that purpose. Moreover, a subsequent remedial measure can be used for "another purpose" such as notice. *Id.* The Court relied on these exhibits to show constructive notice.

Payne next argues that these letters are hearsay and "back door" expert opinions. The Court relied on these to show constructive notice, not the truth of the matter. Payne acknowledges that they were submitted to prove constructive notice.

V.     EXHIBIT J

Vanderburg's Exhibit J is excerpts from Rhodes's deposition. Payne argues that her deposition testimony is character evidence to show that Teel had a propensity to abuse inmates. First, Payne does not explain how he has standing to bring such an argument. Second, Payne argues it is character evidence because "Plaintiff has put forward no evidence that Rhodes was

present or had personal knowledge of any of the events that occurred on May 26, 2005."
(Payne's 2d Mot. Strike at 20). She stated that her testimony was based on her experience and her own personal observations while working at the jail.

## VI.    EXHIBITS K AND L

Exhibits K and L are the trial testimony of Moore and Priest in the excessive force criminal trial *United States v. Teel*, 1:06cr79-LG-JMR.

First, Payne argues that these testimonies are not sworn or authenticated. These exhibits show that the testimony was sworn, and the Court takes judicial notice of the fact that the testimony was in fact sworn in open court before the undersigned during the *Teel* trial. Further, the Court has carefully compared these exhibits to the official trial transcript in *Teel* and finds that the exhibits are an exact copy of the relevant portions of that trial transcript. Therefore, the Court takes judicial notice of the fact that the testimony is authentic.

Payne next argues that the trial transcripts are hearsay. The testimony is admissible and can be submitted in opposition to a motion for summary judgment, although it is not submitted in a form that would be admissible at trial. *See Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *see also*, *Thomas v. Atoms Energy Corp.*, 223 Fed. Appx. 369, 373 (5th Cir. Mar. 21, 2007) (explaining that otherwise admissible evidence can be submitted in a form, such as an affidavit, that would not be admitted at trial). Further, Moore and Priest's trial testimonies are statements against interest. Fed. R. Evid. 804(3). That is to say they were statements "which was at the time of its making so far contrary to the declarant's pecuniary . . . interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable

-24-

person in the declarant's position would not have made the statement unless believing it to be true." *Id.*

Payne next argues this is character evidence because it is offered to prove that Teel had a propensity to use excessive force. Once again, Payne does not explain why he has standing to raise this argument. Further, the Court did not rely on these exhibits to prove Teel used excessive force against Vanderburg.

Payne next argues that the testimony is irrelevant on actual or constructive knowledge, because the testimony and events contained in the testimony came after Vanderburg's alleged beating. The testimony clearly concerns matters that occurred prior to Vanderburg's alleged beating.

Payne also argues the testimony is irrelevant because (1) the prior beatings are not enough to show a pattern of abuse and (2) the testimony is vague. This is in direct contradiction to his argument on character evidence, where he complains that the testimony shows "a propensity to abuse inmates." (Payne's 2d Mot. to Strike at 10). Finally, these arguments go to the weight of the evidence, not the admissibility.

Payne finally argues the testimony is unfairly prejudicial because it will inflame the jury. There was no jury as this was a motion for summary judgment.

For the foregoing reasons, the Court denies Payne's second Motion to Strike.

**IT IS THEREFORE ORDERED AND ADJUDGED**, that for the reasons stated above, Defendant Sheriff George Payne's Motion for Summary Judgment [196] should be and is hereby **GRANTED** on the Section 1983 conspiracy to deny access to courts claim, and Section 1983 punitive damages claim. The Section 1985 claims are dismissed without prejudice. The

remainder is **DENIED.**

IT IS FURTHER ORDERED AND ADJUDGED that Payne's second Motion to Strike

[230] should be and is hereby **DENIED.**

SO ORDERED AND ADJUDGED this the 20th day of May, 2010.


s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE