# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| JOHN AARON VANDERBURG | § | PLAINTIFF |
| | § | |
| VERSUS | § | CAUSE NO. 1:08cv90-LG-RHW |
| | § | |
| HARRISON COUNTY, MISSISSIPPI, BY | § | |
| AND THROUGH ITS BOARD OF | § | |
| SUPERVISORS; et al. | § | DEFENDANTS |

## MEMORANDUM OPINION AND ORDER DENYING
## HARRISON COUNTY'S MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is Defendant Harrison County's Motion for Summary Judgment [193]. Plaintiff John Aaron Vanderburg brought this action for the alleged abuse he received while in the custody of the Harrison County Adult Detention Center ("HCADC"). The County argues (1) it has no control over the Sheriff, (2) there was no evidence of force, and (3) there was no policy of excessive force. The Court has considered the parties' submissions and the relevant legal authority. The motion is denied.

## FACTS AND PROCEDURAL HISTORY

On the evening of Thursday, May 26, 2005, Vanderburg was arrested and charged with careless driving, DUI, no seat belt, resisting arrest, and possession of paraphernalia by the Pass Christian Police Department. He was placed into the custody of the HCADC. Upon his arrival, Officer Ryan Teel and several other officers were using force upon a small female detainee, which included taking her to the floor, wrapping her in a mummy suit, placing a hood on her head, and tying her into a restraint chair, and then leaving her. According to Vanderburg, he asked Teel if he could handle her all by himself. That is when Vanderburg alleges Teel

threatened him. One minute and twenty-four seconds later, Teel and other officers take Vanderburg to the ground while removing his socks and shoes. The officers then shackled Vanderburg to a bench for an hour and a half. Shortly after he was shackled, he testified that another deputy looked in the holding cell and said, "[W]elcome to the Harrison County house of Payne." (Pl.'s Dep. at 117).

Vanderburg subsequently filed this lawsuit. He brings claims against the County under Sections 1983 and 1985 for excessive force; failure to provide medical care; covering up the alleged abuse; and conspiracies to use excessive force and to cover up the alleged abuse.

**DISCUSSION**

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. To make this determination, the Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit. Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). A "material fact" is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The party that bears the burden of proof at trial also bears the burden of proof at the summary judgment stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986). "[W]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon . . . mere allegations or denials . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

SECTION 1983

## I. ALL CLAIMS

The County first argues it is not responsible for the Sheriff's acts and the County cannot be held liable unless the Board of Supervisors themselves violated Vanderburg's rights and set the unconstitutional official policy. The County relies on Mississippi Code Annotated Section 19-25-69.

A claim against the sheriff in his official capacity is treated as a claim against the county, and sheriffs in Mississippi are the final policymakers with respect to all law enforcement decisions made within their counties. *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir. 1996). Where a plaintiff sues a government official in his official capacity and brings the same claims against that government entity, the former claims are merely duplicative of the latter. *Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001). Additionally, the Fifth Circuit has noted in *dicta* that a district court erred when it dismissed Harrison County but refused to dismiss the official capacity claim against Sheriff Payne. *Harris v. Payne*, 254 Fed. Appx. 410, 422 (5th Cir. Nov. 19, 2007). Harrison County is liable for Payne's acts as Sheriff, because he is the final policymaker for Harrison County, regardless of the existence of a policy or custom. *Id.*

## II. EXCESSIVE FORCE

Alternatively, Harrison County argues it is not liable on the excessive force claim because there were "no acts of violence toward [Vanderburg] whatsoever" and there was no excessive force policy "at the HCADC." (County's Mot. Summ. J. at 3). Vanderburg responds that there is a genuine issue of material fact as to whether he experienced excessive force and whether there was such a policy.

A municipality may be held liable under 42 U.S.C. 1983 when its official policies or customs violate the Constitution. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). The policy or custom must cause the constitutional tort. *Id.* at 691. "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Thus, to prove Harrison County is liable under Section 1983, Vanderburg must prove (1) the existence of a policymaker, and (2) an official policy or custom, (3) which is the moving force behind a constitutional violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

### A. CONSTITUTIONAL VIOLATION

The Due Process Clause, applicable to the States via the Fourteenth Amendment, protects a pretrial detainee from excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386, 395 n.11 (1989). The standard for analyzing an excessive force claim under the Fourteenth Amendment is the same as the Eighth Amendment standard. *Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993). This right is violated if there is (1) more than a de minimis injury, (2) which resulted directly and only from the use of force that was excessive to the need, and (3) the force was objectively unreasonable. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). To determine whether the force was excessive, the inquiry is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993). "Often, of course, there will be no evidence of the detention facility official's subjective intent, and the trier of fact must base its determination on objective factors suggestive of intent." *Id.* Some of these factors would be (1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between the need and the amount of force used, (4) the

threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of the forceful response. *Id.* at 1447 n.29.

The County only challenges whether there were "acts of violence." There is evidence that Vanderburg's handcuffs were tightened, he was slammed to the ground, his leg was pulled over his head, and he was shackled to a bench for an hour and a half. First, he testifies to this. Secondly, the video corroborates his testimony.

### B. POLICY OR CUSTOM

The Court next examines whether there is evidence of a policy or custom of excessive force at the jail. "Official policy is ordinarily contained in duly promulgated policy statements, ordinances, or regulations." *Piotrowski*, 237 F.3d at 579. Where the policy is facially constitutional, the plaintiff must prove that "it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Id.* (quoting *Bd. of the Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997)). A custom is a "persistent, widespread practice of [government] officials or employees, which, although not officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579. "Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). The Fifth Circuit held:

> Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Id.* at 842. "[T]he sheer numerosity of incidents can provide evidence of constructive knowledge." *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

Vanderburg argues that there was a long-term, widespread custom of using excessive force on pre-trial detainees and other inmates at the HCADC. First, he testified that after the use of force, one of the deputies welcomed him to the house of pain/Payne. The video shows this deputy raise his fist to Vanderburg. He also presents evidence of hundreds of instances of excessive force at the HCADC from 2004 to 2006. He presents evidence that the Sheriff and the Board of Supervisors were warned of this widespread abuse several times before Vanderburg's incident on May 26, 2005.

For example, former Deputy Morgan Thompson, Sergeant Dedri Caldwell, and Deputy Thomas Wills each admitted to using unjustified force on over one hundred inmates while they worked at the jail and to witnessing over one hundred additional unjustified assaults committed by other deputies. According to Caldwell, the conspiracy began in 2001. According to Thompson, it ended in September 2006. Stolze and Priest admitted that they and other deputies engaged in a conspiracy to deprive persons of their right to be free from excessive force. This conduct occurred from 2003 to 2006. Likewise, former deputies Regina Rhodes, Daniel Evans, Karl Stolze, and William Priest admitted to personally participating in several instances of excessive force and to witnessing additional instances.

Rhodes testified that it was common for the correction officers to taunt the inmates who were brought into the booking room. She heard Stolze, Officer in Charge Teel, Thompson, and Wills engage in this taunting. Intoxicated inmates were more likely to be taunted because "[t]hey

were easier targets." (Rhodes Dep. at 13). She observed a pattern of abusing inmates that included "striking, punching, kicking, choking and otherwise assaulting inmates in circumstances that did not justify the use of force." *Id.* at 13-14. She said this excessive force occurred "almost daily while I was employed there," "from May 2004 to February 2006." *Id.* at 14; (Rhodes Plea Agreement at 3). She testified that Teel often encouraged the correction officers to use excessive force and to get involved in instances of excessive force.

Timothy Brandon Moore worked at the jail from 2002 to 2005. He testified that booking officers were mistreating people at the jail. There was a meeting on April 20, 2005, with the booking staff. The purpose of the meeting "was basically to blast booking. It was aimed at the excessive force being used." (Moore Test. at 548-49). Despite this meeting, there was no change in booking. It was a daily practice to prepare false reports to cover up excessive force. The booking officers had discussions about the video cameras in booking and how to avoid detection of excessive force. "Captain Gaston said several times, if you have to do anything, do it off camera, in the shower or in the hallway. . . . The cameras were our enemy." *Id.* at 555. The booking officers had theme nights for different days of the week. These included, "Thump a Thug Thursday, Fight Night Friday, Slap a Ho Saturday." *Id.* at 556. They were told to "kick[] ass and not tak[e] names," which meant "we were using excessive force and not writing reports." *Id.* According to Moore the booking officers felt it was funny to use excessive force, and they would laugh and egg on each other. Whenever a female officer had a female detainee in the shower for the dress out procedure, Teel would lead the booking officers in a chant of, "Spray the bitch," to encourage the female officer to use OC spray on the detainee. *Id.* at 567. When he led these chants, he would not be able to see if any force was needed. If the female officer did not

spray the detainee, the officer "[w]ould be known as an inmate lover." *Id.*

Priest testified, whenever a detainee was being loud, the officers were instructed by Captain Gaston to get the detainee quiet by whatever means necessary.

> A. Again, sometimes you could talk a person out of it. Other times, we may have to get a little physical and restrain them to the bench using the leg restraints.
>
> . . .
>
> A. There's several incidents. Picking individuals up and throwing them on the bench, drag them to the floor, things of that nature.
>
> Q. And at the time that this force was used, what was the person doing?
>
> A. Probably just a whole lot of talking, belligerent actions.

(Priest Test. at 403). The booking officers were instructed, "If an individual had gotten on our nerves, was continuing to become a problem, maybe we need to teach that guy a lesson." *Id.* at 408. Several times Priest witnessed booking officers choke people until they passed out. The officers would sometimes spray the toilet seats and benches with OC spray. They then would laugh when an inmate would become contaminated with the spray. The booking officers would have multiple conversations about using excessive force and how to make it look like it was the inmate's fault. "Jokingly, if somebody was being abused. It was sort of the thing to say, 'Stop resisting,' whether they were or were not." *Id.* at 435. Priest likewise testified that the officers joked about and encouraged each other to use excessive force. He, too, testified it was a practice to yell, "Spray the bitch," every time a female officer was dressing out a female detainee. If the officer did not, the others "[m]ight jokingly call her an inmate lover." *Id.* at 436.

> A. If you didn't take action against an individual inmate, then you may be labeled as inmate lover, somebody that is sympathetic towards inmates.

Q. What did it mean to be labeled an inmate lover?

A. Well, you're either with the group or you're not with the group.

*Id.*

Priest testified that, on October 4, 2005, detainee Only Al-Khidhr was brought in the booking room. Priest was not present, but he was briefed about Al-Khidhr when Priest came in on the next shift. He saw the booking photo, which showed "a brutal mess. He was beat up pretty bad." *Id.* at 417. Thompson admitted to Priest that he had beat up Al-Khidhr. Thompson posted at least six copies of the booking photo all over booking. When Priest took some down, he "was kind of warned away by Thompson telling me don't take them down. Leave them up." *Id.* at 418. The rest remained up at least throughout the day.

Rhodes testified that red light/green light was a phrase used in booking:

A. Red light would be the facial area . . . you weren't supposed to hit anything that would show on a booking photo, and green light would be the rest of the body.

Q. All right. And how did y'all come to use red light, green light and determine where you should and shouldn't hit?

A. Well, after Deputy Thompson had a particularly bad booking shot of an inmate named Only, OIC Teel had a impromptu meeting with our shift in the back of booking and inmate records and said that red light, green light–you know, that the chief was–the chief, Captain Gaston, was upset about the booking photo and that we needed to be more careful.

Q. All right. Be more careful where you hit people?

A. Yes, sir.

. . .

Q. Okay. So it was okay to hit people as long as it didn't show up on the booking photo?

> A. Yes, sir.

(Rhodes Dep. at 10-11). Her testimony indicates the red light green light practice was instituted in response to allegations that a deputy had struck another inmate in such a way as to show up on the booking photo. Priest likewise testified that this practice was known to him. After Priest had hit a detainee in the mouth, Priest was chastised by Stolze:

> A. He wasn't concerned about the inmate. He was concerned about what I had done.
>
> Q. Why was he concerned about what you had done?
>
> A. He relayed to me that sort of phrase that we would use, red light/green light. Red light meaning you don't hit to a part of the body that you can visibly see a mark. Green light meaning you can hit an individual where it cannot normally be seen on the body, things of that nature.

(Priest Test. at 424). This was a phrase with which Priest was already familiar.

There is evidence that, as early as February of 2005, Sheriff Payne was actually notified by the United States Department of Justice of its finding of 31 instances of force in a one month period from November 2004 to December 2004, which represented both a "serious increase in the use of force" as well as "a very disturbing pattern of misuse of force." (Pl.'s Resp. Ex. E at 3); (Pl.'s Resp. Ex. F at 3). When asked whether or not he should have known of the custom of excessive force, Sheriff Payne first testified, yes. As he points out, he then denied this, but that is a credibility question for the jury.

Taken together, this and other evidence permit a reasonable jury to find that there was a custom of excessive force that was sufficiently widespread and persistent to constitute an official policy. Immediately after the alleged assault, another deputy allegedly menacingly welcomes Vanderburg to the "house of Payne." Further, the evidence that there were hundreds of instances

-10-

of excessive force, and almost daily occurrences for at least one year prior to May 26, 2005, is sufficient to show that Sheriff Payne had at least constructive knowledge. He admitted that he should have known and admitted that he was on notice for three months prior to the subject incident. It is undisputed that even members of the Board of Supervisors for the County, who were further removed from the jail than Sheriff Payne, were on notice of the alleged culture of violence at the jail. The County is not entitled to summary judgment on the excessive force claim.

**IT IS THEREFORE ORDERED AND ADJUDGED**, that for the reasons stated above, Defendant Harrison County's Motion for Summary Judgment [193] should be and is hereby **DENIED.**

**SO ORDERED AND ADJUDGED** this the 20th day of May, 2010.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE